```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
```

STERLING EQUIPMENT, INC.,        )
                                 )
        Plaintiff,                )    CIVIL ACTION NO.
                                 )    12-11501-DPW
                                 )
    v.                           )
                                 )
M/T GREAT EASTERN and her engines, )
machinery, tackle, appurtenances,  )
etc., *in rem*, and              )
FB TANKSHIP IV LTD., *in personam*, )
                                 )
        Defendants.               )

### MEMORANDUM & ORDER
September 19, 2014

The Plaintiff, Sterling Equipment, Inc., is the owner of a deck barge, Excalibur. On the night of January 30, 2012, a crane aboard Excalibur sustained damage apparently caused by the wake of a passing vessel. Believing that passing vessel to be the M/T Great Eastern, Sterling has sued Great Eastern along with its owner, FB Tankship IV LTD., alleging negligence and gross negligence.

Through a summary judgment motion,[1] the defendants contend that the evidence unearthed during discovery is insufficient to show that the damage was caused by Great Eastern, rather than by another vessel or source, and so seek summary judgment in their favor.

---

[1] I note that if this admiralty case were to go to trial, I would be the fact finder. But my role in summary judgment practice is not to find facts but rather to determine whether there are any genuine issues of material fact for whoever is the ultimate fact finder to resolve.

# I. FACTUAL BACKGROUND

## A. *The Wake Incident*

In the early hours of January 30, 2012, the barge Excalibur, along with the tugboat, Miss Yvette, were anchored outside the ship channel of the East Passage of Narragansett Bay, just south of the Pell Bridge in Newport Rhode Island. Aboard the Excalibur was a Manitowac 4600 crane owned and operated by Sterling.

That evening, the Miss Yvette had four crew members on board. The Excalibur was unmanned. Captain Louis Gilliken was the designated master of the Miss Yvette, while Captain William Hoolahan was the "second captain." The crew was scheduled to work in pairs in six hour shifts. Captain Gilliken and crew member John Dolliver were on the watch scheduled from 6:00 pm until midnight on January 29, 2012. They were relieved by Captain Hoolahan and crew member Edwin Rose who were scheduled for the "mid watch" from midnight until 6:00 am on January 30, 2012. Captain Gilliken testified in his deposition that he was relieved by Captain Hoolahan "at midnight on January 30th, 2012." Captain Hoolahan was somewhat less precise in his deposition, testifying that the change-over occurred "somewhere close" to midnight.

Captain Gilliken testified that he, Captain Hoolahan, and the two crew members were below deck in the galley at the time of the shift change when they felt a wave hit the barge. He testified that this event "[h]appened right after midnight. At

midnight. It could be a thirty minute difference, but it was at midnight." While at one point, he testified that he was "certain" the accident occurred between midnight and 12:30 am on January 30, 2012, he qualified this somewhat later in his deposition, saying that the wake occurred "somewhere around midnight, 1:00, somewhere." In response to questions, he further explained: "Q: It was right at the time of the turnover on your watch, is that right? A. Exactly, or a little after my turnover. Q. And the turnover of our watch was at midnight, is that right? A. Exactly."

After feeling the wave strike the tugboat, Captain Gilliken opened the galley door to check on the barge and crane. He could only see part of the barge and could not see all of the crane, but he could hear the two blocks of the crane striking together.

Captain Hoolahan testified that he was in the wheelhouse when he saw an outbound ship moving quickly. He then went down to the galley and was there when the wave struck. Captain Hoolahan described the wave hitting the barge as "severe" and said "we got smashed with like a whomp, like a huge offshore." He said that the tugboat "felt like it was lifted up in the air and thrown against the Excalibur" by the wave. He returned to the wheelhouse after talking with the crew and observed the aft of the passing vessel. He testified that he observed a "large ship" traveling away "really fast." He also noted that the vessel had a large superstructure on its aft section. Captain

Hoolahan testified that the wave struck the barge "sometime after midnight" and that he did not remember "the exact time," but it was while he was on watch. Captain Hoolahan believed and believes that the wake was caused by the Great Eastern, but he could not recall or state a basis for his belief.

Neither Captain Gilliken nor Captain Hoolahan radioed the passing vessel that had caused the wake.

## B. *The Transit of the Great Eastern Past the Pell Bridge*

The Great Eastern was docked pierside in Providence, Rhode Island at midnight on January 30, 2012, approximately 20 miles north of the Pell Bridge in Newport Rhode Island. The pilot for the Great Eastern that day was Vincent Kirby. Captain Kirby boarded the Great Eastern shortly before midnight and the vessel departed Providence at approximately 12:12 am on January 30, 2012. Captain Kirby reported that visibility was excellent on the outbound transit of Narragansett Bay.

The Great Eastern passed Sabin Point on the Providence River at approximately 12:40 am. After that time, it maintained a speed between 14 and 15 knots until it passed under the Pell Bridge at approximately 1:50 am. During the outbound transit, Captain Kirby monitored Automatic Identification System ("AIS") transmissions, radar and VHF radio channels.[2] He encountered no

---

[2] AIS is a system used by ships and vessel traffic for the identification of vessels at sea. AIS transceivers transmit and receive information concerning the identification, position, course, speed, and other ship data.

traffic during his navigation from Providence to the Pell Bridge and received no communications other than from the tugboats that undocked the Great Eastern in Providence. He was, however, aware of a Local Notice to Mariners issued by the Coast Guard describing work being performed on the Pell Bridge and the presence of barges in the area. That Notice also stated that "Mariners are requested to reduce speed through the bridge construction area and should also exercise caution while transiting the area."

While transiting beneath the Pell Bridge, Captain Kirby observed two barges and a tugboat moored in the vicinity of the bridge, but observed no lights or activity on the barges or tugboats and received no AIS signal from them. At the nearest point of approach, the Great Eastern passed within approximately 1,000 feet of the moored barges.

Captain Kirby disembarked from the Great Eastern at approximately 6:00 am, unaware of any wake incident involving the barges at the Pell Bridge.

## C. *Sterling's Investigation of the Incident*

At approximately 8:15 am on January 30, 2012, Captain Gilliken called the Northeast Marine Pilots ("NEMP") dispatch office seeking the name of the ship that had passed the Pell

---

Although the tugboat Miss Yvette is equipped with AIS, it was not functional on the evening of January 30, 2012. As a result, the Miss Yvette was not visible on the AIS displays of passing vessels, nor did it receive data transmitted by passing vessels.

Bridge around midnight.  NEMP's dispatcher, Timothy Rochford, gave him the name Great Eastern and the time that the vessel left Providence.

Captain Gilliken regularly recorded events occurring on the Miss Yvette in a log book which he transferred to an electronic spreadsheet.  He made an entry for the date January 29, 2012 "0001 The Ship Great Eastern thur a five or six wake coming thur Newport Bridge."  He explained that the entry was mistakenly entered for January 29, when, in fact, it should have been dated January 30 and that it indicated an event occurring at 12:01 am.  This entry was made during the day on January 30, 2012, after Captain Gilliken had spoken with NEMP dispatch.

On January 30, 2012, Captain David Clark, who was assigned by Sterling to investigate the incident, submitted a Marine Accident Report to the Coast Guard.  That report stated:

> The Excalibur was anchored 300 yards east of main ship channel under the Newport Bridge.  Shortly after midnight the Tanker Great Eastern went by at a high rate of speed.  The resulting wake made the crane barge roll severely and the main block and ball swung into the crane lacing (support structure for the boom).  During this the ball was ripped off the secondary hoist and was lost overboard.  An visual inspection was made of the boom and the paint on the lacings was gouged by the block and ball.  The actual extent of the damage will not be known until the boom is lowered.

The report indicated that the incident occurred at 12:30 am on January 30, 2012.

When preparing this report, Captain Clark spoke by phone with Captains Gilliken and Hoolahan, and with crane mechanic

-6-

Kevin Stinson. He also looked at historical AIS data available on a Marine Traffic internet site. His review of that website showed that, aside from the Great Eastern, "there was no other traffic that went by . . . there was nothing after midnight and it was the only vessel moving at what I would consider a pretty quick speed." Captain Clark's conclusion that the wake damage was caused by the Great Eastern was based on his review of the Marine Traffic site and his conversations with the Miss Yvette crew members.

### D. The Prior Wake Incident

Two days prior to the wake incident, on January 28, 2012, Pilot Howard McVay had navigated the Great Eastern north under the Pell Bridge. During that inbound trip to Providence, Pilot McVay received a radio call while passing the Pell Bridge that said "Thanks for the wake, Cap't." He did not know the source of the call. Captain Hoolahan testified that he was particularly upset about the January 30, 2012 wake incident because the same vessel had passed just days earlier "throwing a wake."

### E. The Plaintiff's Expert Reports

The plaintiff has submitted three expert reports in this matter. The first, written by Captain David Witherill, provides an opinion regarding the Notice to Mariners that was in effect on January 30, 2012, and whether the Great Eastern violated that Notice when it transited under the Pell Bridge that day.

-7-

Captain Witherill opined that "the [Notice to Mariners] requested a speed reduction that was not made by the M/T Great Eastern on the morning of January 30th, and [he] can find no reason in the [Notice to Mariners] for not adhering to this request." He also opined that the Great Eastern's speed of 14-15 knots "seems to indicate that it was traveling much faster than full ahead maneuvering speed." He concluded:

> In summary I find that the local Notice to Mariners in affect for January 30, 2012 were very clear in the request for a speed reduction at the Newport Pell Bridge. The M/T GREAT EASTERN did not reduce speed in its transit under the bridge and likely were transiting at a higher speed than full maneuvering. The wake from the GREAT EASTERN is responsible for causing damages incurred by the Sterling Equipment barges.
>
> In doing so the GREAT EASTERN violated the request in the Notice to Mariners for a speed reduction. The GREAT EASTERN also violated Rule 2a of the U.S. Inland Rules of the Road. A reasonable operator of a vessel the size of the M/V GREAT EASTERN under known circumstances would reduce speed when transiting past moored vessels.

The plaintiff's second expert report, drafted by Moses Calouro, includes a review of the AIS system and the AIS data recorded in the vicinity of the Pell Bridge from 11:30 pm on January 29, 2012 until 3:50 am on January 30, 2012. His report states that the Great Eastern crossed the Pell Bridge at 1:55 am on January 30th 2012. It concludes by stating that:

> The Great Eastern was the only AIS equipped vessel underway near the Claiborne Pell Bridge during the report period. While the Great Eastern was within [the vicinity of the Pell Bridge], its speed was never less than 14.7 knots.

In response to this report, the defendants have noted the undisputed testimony of Captain Witherill in which he explained that vessels will only appear on AIS systems if those vessels are equipped with AIS systems themselves, if those systems are functional, and if those systems are turned on.

The plaintiff's third expert report, drafted by Stephen Perry, discusses the damage sustained by the crane aboard the Excalibur on the evening of January 30, 2012. Mr. Perry opines:

> Upon inspection of the crane boom it became apparent that the one of the two hoist ropes and a roller along with its mounting brackets was damaged likely due to excessive movement created by wave action. In which the auxiliary hoist line became entangled with the mounting bracket used to fix the roller to the boom. In addition to the observed damage it was also reported to me that the headache ball used to overhaul the auxiliary hoist line was missing and presumed to have been knocked loose, apparently falling into the water.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986). The question is whether, viewing the facts in the light most favorable to the nonmoving party, there is a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); *Casas Office*

*Machines, Inc.* v. *Mita Copystar Am., Inc.*, 42 F.3d 668, 684 (1st Cir. 1994).

### III. ANALYSIS

#### A. *The Plaintiff Cannot Establish the Wake that Damaged Sterling's Crane was Caused by the Great Eastern.*

It is a well-established rule of admiralty law that if the wake generated by a passing ship damages a docked vessel, the moving vessel is presumed to be at fault. *See, e.g., Maxwell* v. *Hapag-Lloyd Aktiengesellschaft, Hamburg*, 862 F.2d 767 (9th Cir. 1988); *West India Fruit & Steamship Co.* v. *Raymond*, 190 F.2d 673, 674-75 (5th Cir. 1951). At the same time, it is an "essential part" of a wake damage claim that the plaintiff demonstrate that the swells causing damage "came from the particular vessel against which the claim is asserted." *O'Donnell Transp. Co.* v. *M/V Maryland Trader*, 228 F. Supp. 903, 909 (S.D.N.Y. 1963). *See also New Orleans Steamboat Co.* v. *M/T Hellespont Glory*, 562 F. Supp. 391, 392 (E.D. La. 1983) ("*Once a properly moored vessel proves that a passing vessel caused swells or suction that resulted in damage to the moored vessel*, the passing vessel is obligated to exonerate itself from blame.")(emphasis added). If the plaintiff is unable to establish the essential causation element, its claim fails.

The defendants' motion for summary judgment hinges on whether Sterling, the plaintiff, can establish this "essential"

element and demonstrate that the wake that hit its barge and damaged its crane was caused by the Great Eastern--rather than by another ship or some other vessel.

The plaintiff musters the following evidence to demonstrate that the Great Eastern was the source of the wake that hit the Excalibur and damaged the crane aboard it: (1) the Great Eastern navigated past the Pell Bridge at 1:50 am on January 30, 2012; (2) at the time that it passed beneath the Pell Bridge, the Great Eastern was making approximately 14 knots; (3) no other vessel equipped with a functioning and operational AIS system transited past the Pell Bridge between 11:30 pm on January 29, 2012 and 3:50 am on January 30, 2012; and (4) the pilot of the Great Eastern did not observe any other vessels during his outbound route from Providence through the Pell Bridge.

None of this evidence, however, demonstrates that Great Eastern was the source of the wake that damaged Sterling's crane. First, the uncontradicted evidence is that the Great Eastern passed the Pell Bridge at 1:50 am, while the wake incident happened at some earlier time. Captain Gilliken testified that he was "certain" the wake incident occurred between midnight and 12:30 am, but later extended this period to nearly 1:00 am. He also testified that the wave strike occurred close to the time of the change of watch, which occurred at or close to midnight. Captain Hoolahan testified that the incident occurred during his

-11-

watch (which began at midnight) and the incident occurred sometime after midnight, but he could not recall the precise time.  Their deposition recollections were supported by the reports filed by Captain Clark--which noted the incident happened "shortly after midnight" based upon the statements of the captains--and by the log book in which Captain Gilliken recorded the event as occurring at 12:01 am.  Accordingly, given the uncontradicted evidence of the direct witnesses to the event, the wave strike occurred at or around midnight – or at the latest close to 1:00 am.  The Great Eastern, however, did not pass the Pell Bridge until 1:50 am--meaning that the Great Eastern could not be the source of the wake damage.

Second, although no other AIS transmissions were recorded in the vicinity of the Pell Bridge in the hours surrounding the wave-strike (aside from those from the Great Eastern), this does not demonstrate that no other vessels transited through the area in the relevant time frame.  As the plaintiff's own expert, Captain Witherill, confirmed, a vessel that was not equipped with AIS, whose AIS was not functional, or whose AIS was not turned on would not be recorded on the AIS system.  The AIS data does not eliminate the possibility that such a vessel transited beneath the Pell Bridge between 11:30 pm on January 29, 2012 and 3:50 am on January 30, 2012.  In addition, there is no evidence, expert or otherwise, that a wave of the size which struck the Excalibur

can only be generated by a 300-ton or greater ship, the type of vessel required to carry an AIS transmitter.[3] Finally, the fact that Captain Kirby did not encounter any traffic during his outbound transit from Providence through the Pell Bridge is inconsequential. If another vessel, also outbound, had passed the Pell Bridge ahead of the Great Eastern, the Great Eastern, headed the same direction, would not necessarily cross its path.[4]

### B. The Burden of Proof is Not Shifted under the "Pennsylvania" Rule

To anchor its claim, Sterling seeks to invoke the rule established in *The Steamship Pennsylvania* v. *Troop*, 86 U.S. 125 (1874). *Pennsylvania* held that when ships collide and "a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster." *Id.* at 136.

---

[3] At most, the plaintiff can point to the inconclusive testimony of Captain Witherill that he cannot recall seeing a tug under 300 tons throw a wake of more than one to four feet and Captain Hoolahan's observation of the aft of a "big ship" following the wave strike. Captain Witherill notably testified that was unable to say whether or not a 100 ton tug could throw a wake larger than one to four feet.

[4] Plaintiff repeatedly refers to an incident on January 28, 2012 during which "someone" called the Great Eastern by radio and said, "[T]hanks for the wake, Cap't." A different pilot, Captain McVay, was navigating the Great Eastern during that transit. While I draw all inferences in favor of plaintiff here as the nonmovanat, this prior wake incident does not permit an inference that the Great Eastern, piloted by Captain Kirby, was the source of the wake that caused damage to the crane on January 30, 2012.

-13-

Accordingly, where a colliding ship is in violation of a statutory prohibition, that ship has the burden "of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." *Id.*

The plaintiff points to violations of Rule 2 and Rule 6 of the Inland Navigation Rules as predicates for triggering application of the *Pennsylvania* Rule.[5]  Rule 2 states that "[n]othing in these Rules shall exonerate any vessel, or the owner, master, or crew thereof, from the consequences . . . of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."  33 CFR § 83.02.  As I have previously explained, "[i]f the *Pennsylvania* Rule was triggered by this 'good seamanship' requirement . . . it would apply in almost every maritime case."  *In re Alex C Corp*, 2011 A.M.C. 157, 2010 WL 4292328, at *7 n.14 (D. Mass. Nov. 1, 2010).  Because Rule 2 is simply a precatory statement and the Inland Navigation Rules run alongside rather than supplant existing Maritime Rules and Customs, Rule 2 does not stand as a statutory

---

[5] The Inland Navigation Rules were originally enacted by Congress and codified as 33 U.S.C. §§ 2001-2038.  They were repealed in 2010 and subsequently promulgated as Part 83 of Title 33 of the Code of Federal Regulations.  The Rules "apply to all vessels upon the inland waters of the United States."  33 C.F.R. § 83.01.

rule the violation of which would provide a basis for invoking the *Pennsylvania* Rule's burden shifting regime.

Rule 6 provides that "every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions" and lists factors to be taken into account in determining an appropriate speed. 33 CFR § 83.06. Though defendants claim that this rule is too indefinite to act as a predicate trigger for the *Pennsylvania* Rule, more than one court has held the contrary. *See, e.g., In re Backcountry Outfitters, Inc.*, 2008 WL 516792, at *8 (N.D. Fla. Feb. 22, 2008) (invoking *Pennsylvania* Rule based upon violation of Rule 6); *Maritime & Mercantile Intern. L.L.C. v. U.S.*, 2007 A.M.C. 814, 2007 WL 690094, at *22-23 (S.D.N.Y. February 28, 2007)(same). I agree with these courts. The rule requires that vessels proceed at a sufficiently safe speed to avoid collisions, taking into account prevailing conditions and other factors. Violation of Rule 6 is a sufficient predicate to triggering the *Pennsylvania* Rule.

In addition, the expert opinion of Captain Witherill that a "reasonable operator of a vessel the size of the M/V GREAT EASTERN under known circumstances would reduce speed when transiting past moored vessels," coupled with evidence regarding the Great Eastern's speed when passing the Pell Bridge and the

-15-

Notice to Local Mariners requesting a reduction in speed when transiting the area, is sufficient to raise a genuine dispute regarding whether the Great Eastern violated Rule 6 by failing to reduce its speed when approaching and crossing beneath the Pell Bridge.

There exists, however, another, and in this case insurmountable, obstacle to triggering and applying the *Pennsylvania* Rule. While that rule alters the burdens of demonstrating causality, it does not relieve the plaintiff entirely of its burden in this regard. As the First Circuit has explained, "[i]f a plaintiff can establish both that the defendant breached a statutory duty *and that the breach is relevant to the casualty in question*, the defendant assumes the burden of proving that its breach could not have caused plaintiff's damages." *Pan American Grain Mfg. Co., Inc.* v. *Puerto Rico Ports Authority*, 295 F.3d 108, 115–16 (1st Cir. 2002) (emphasis added). Thus, "the violation or 'fault' must have contributed to the casualty, at least in some degree . . . a plaintiff must establish a relationship between the regulatory violation and the injury in order to invoke the *Pennsylvania* Rule." *Poulis-Minott* v. *Smith*, 388 F.3d 354, 364 (1st Cir. 2004).

In *Poulis-Minott*, the First Circuit faced "a casualty for which it is virtually impossible to identify the cause" and so

found it impossible to determine whether the statutory violations "contributed to the casualty." *Id.* at 364. In such circumstances, the court concluded that the *Pennsylvania* Rule was inapplicable. Much the same logic applies here. If the Great Eastern violated Inland Navigation Rule 6 but was not the cause of the wake which damaged the barge Excalibur, there is no relationship between the statutory violation and the injury. "There must be, in other words, proof that under the circumstances there was a reasonable possibility that compliance with the regulatory standard would have prevented the accident." *Id.* Because, as discussed above, the plaintiff is unable to show that the Great Eastern generated the wake which caused the harm to the crane aboard the Excalibur, this proof is lacking and the plaintiff is unable to invoke the burden-shifting regime of the *Pennsylvania* Rule.

### IV. CONCLUSION

For the reasons set forth more fully above, Defendants' motion for summary judgment (Dkt. No. 26) is hereby GRANTED. The Clerk of the Court is hereby ordered to enter judgment in favor of the Defendants, M/T Great Eastern and FB Tankship IV Ltd.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT